Case No. 10-2348

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

EMILY KROLL,

Plaintiff-Appellant,

v.

WHITE LAKE AMBULANCE AUTHORITY,

Defendant-Appellee.

Appeal from the United States District Court for the
Western District of Michigan, Southern Division

**BRIEF ON APPEAL OF DEFENDANT-APPELLEE, WHITE LAKE
AMBULANCE AUTHORITY**

**\* \* \* \* ORAL ARGUMENT REQUESTED \* \* \***

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

PLUNKETT COONEY

By:   MICHAEL S. BOGREN (P34835)
Attorney for Defendant-Appellee
White Lake Ambulance Authority
950 Trade Center Way, Suite 310
Kalamazoo, MI  49002
(269) 226-8822

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 10-2348 _____        Case Name: Kroll v. White Lake Ambulance Auth. _____

Name of counsel:  Michael S. Bogren _____

Pursuant to 6th Cir. R. 26.1, White Lake Ambulance Authority _____
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

---

### CERTIFICATE OF SERVICE

I certify that on _____ February 1, 2011 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Michael S. Bogren _____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)   **Parties Required to Make Disclosure**.   With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.   A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.   A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)   **Form and Time of Disclosure**.   The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES......................................................................................... i

STATEMENT IN SUPPORT OF ORAL ARGUMENT........................................... iv

COUNTER-STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ...................................................................................................... 1

COUNTER-STATEMENT OF THE ISSUES FOR REVIEW ................................. 2

COUNTER-STATEMENT OF THE CASE............................................................... 3

COUNTER-STATEMENT OF FACTS ..................................................................... 4

COUNTER-STATEMENT OF THE STANDARD OF REVIEW ......................... 10

SUMMARY OF THE ARGUMENT........................................................................ 11

ARGUMENT I ......................................................................................................... 14

> THE DISTRICT COURT DID NOT ERR IN GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT WHERE THE COUNSELING AT ISSUE DID NOT CONSTITUTE A MEDICAL EXAMINATION............................................................. 14

ARGUMENT II ........................................................................................................ 27

> THE PLAINTIFF LACKS STANDING TO ASSERT A CLAIM UNDER THE ADA AS SHE NEVER UNDERWENT COUNSELING AND CANNOT DEMONSTRATE THAT SHE SUSTAINED AN ACTUAL CONCRETE INJURY................ 27

CONCLUSION ........................................................................................................ 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

**Federal Cases:**

*ACLU v. Nat'l Sec. Agency,*
   493 F.3d 644 (6th Cir. 2007) ................................................................. 28

*Albemarle Paper Co. v. Moody,*
   422 U.S. 405; 95 S. Ct. 2362; 45 L.Ed.2d 280 (1975) .................................. 28, 29

*Armstrong v. Turner Indus., Inc.,*
   141 F.3d 554 (5th Cir. 1998) ............................................................... 30

*Barnes v. Broward County Sheriff's,*
   130 F.3d 443 (11th Cir. 1997) ............................................................. 17

*Barnes v. Cochran,*
   944 F. Supp. 87 (S.D. Fla. 1996) ..................................................... 17, 18, 25

*Conroy v. New York State Dept. of Corr. Services,*
   333 F.3d 88 (2d Cir. 2003) ................................................................. 21

*Franzel v. Kerr Mfg. Co.,*
   959 F.2d 628 (6th Cir. 1992) ............................................................... 28

*Griffin v. Steeltek, Inc.,*
   160 F.3d 591 (10th Cir. 1998) ............................................................. 31

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.,*
   542 F.3d 529 (6th Cir. 2008) ............................................................... 10

*In re Morris,*
   260 F.3d 654 (6th Cir. 2001) ............................................................... 28

*Indergard v. Georgia-Pac. Corp.,*
   582 F.3d 1049 (9th Cir. 2009) ............................................................. 22

*Jaques v. Herbert,*
   447 F. Supp. 2d 858 (N.D. Ohio 2006) ................................................. 19, 20

*Laird v. Tatum,*
   408 U.S. 1; 92 S.Ct. 2318' 33 L.Ed.2d 154 (1972) ...................................... 27

*Lewis v. Philip Morris, Inc.,*
   355 F.3d 515 (6th Cir. 2004) ............................................................... 23

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555; 112 S. Ct. 2130; 119 L.Ed.2d 351 (1992) ............................. 27, 28

*Meritor Savings Bank v. Vinson,*
   477 U.S. 57; 106 S. Ct. 2399 (1986)..................................................................... 15

*Morrison v. Bd. of Educ. of Boyd County,*
   521 F.3d 602 (6th Cir. 2008) ......................................................................... 27, 28

*Raines v. Byrd,*
   521 U.S. 811; 117 S. Ct. 2312; 138 L.Ed.2d 849 (1997) ..................................... 27

*Risch v. Royal Oak Police Dept.,*
   581 F.3d 383 (6th Cir. 2009) ................................................................................ 24

*Roe v. Cheyenne Mountain Conference Resort,*
   920 F.Supp. 1153 (D. Colo. 1996), *aff'd in pertinent part,* 124 F.3d 1221 (10th
   Cir. 1997) ............................................................................................................. 21

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26; 96 S.Ct. 1917; 48 L.Ed.2d 450 (1976) ........................................... 27

*Sperle v. Mich. Dep't of Corr.,*
   297 F.3d 483 (6th Cir. 2002) ............................................................................... 10

*Sullivan v. River Valley Sch. Dist.,*
   197 F.3d 804 (6th Cir. 1999) ......................................................................... 20, 21

*Tice v. Ctr. Area Transp. Auth.,*
   247 F.3d 506 (3d Cir. 2001)................................................................................. 30

**Statutes:**

29 C.F.R. § 1630.14(c) ........................................................................................ 15, 17

42 U.S.C. § 12112(d)............................................................................................ 30, 31

42 U.S.C. § 12112(d)(4)(A) ......................................................... 11, 12, 14, 17, 30

42 U.S.C. § 12117(a)................................................................................................. 28

Americans with Disabilities Act... iv, 2, 3, 11, 13, 14, 17, 20, 21, 22, 26, 27, 28, 29,
   30

**Miscellaneous:**

EEOC Enforcement Guidance........................................................................... 11, 15

Brennan in Harvard Law School Occasional Pamphlet No. 9, 22-23 (1967).......... iv

Ginsburg, Address to the Dinner of American Law Institute, 58 (5/19/94) ............ iv

Merritt, *Judges on Judging: The Decision-Making Process in Federal Courts of Appeal*, 51 Ohio St. L. J. 1385, 1386-1387 (1991)................................................. v

Robert L. Stern, *Supreme Court Practice*, p. 671 (2002) ......................................... iv

**Constitutional Provisions:**

U.S. Const., Art. III.............................................................................27, 28

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellee, White Lake Ambulance Authority, requests this Court to docket this appeal for oral argument. Argument is particularly appropriate in this appeal because it involves relatively novel issues concerning the Americans with Disabilities Act. Oral argument will afford the Court the opportunity to pose any questions it may have concerning the facts or the specifics of the parties' respective positions. Defendant-Appellee's counsel believes that participation in oral argument will be beneficial, and that the decisional process will be significantly aided by the Court's grant of oral argument.

Justice Brennan once said that "oral argument is the absolutely indispensable ingredient of appellate advocacy. . . . [O]ften my whole notion of what a case is about crystallizes at oral argument." Robert L. Stern, *Supreme Court Practice*, p. 671 (2002) quoting Brennan in Harvard Law School Occasional Pamphlet No. 9, 22-23 (1967). Justice Ginsburg has likewise explained that oral argument gives counsel "notice and a last clear chance to convince the Court concerning points on which the decision may turn." *Id.* quoting Ginsburg, Address to the Dinner of American Law Institute, 58 (5/19/94). Sixth Circuit Senior Judge Gilbert S. Merritt likewise recognized that the core of the adversary process is oral argument, a tradition which provides a "hedge against misdiagnosis and misperformance in the brief, the one last chance of locating a postern missed in the advance survey."

iv

Merritt, *Judges on Judging: The Decision-Making Process in Federal Courts of Appeal*, 51 Ohio St. L. J. 1385, 1386-1387 (1991)

## COUNTER-STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The Defendant concurs in the Plaintiff's Jurisdictional Statement.

## COUNTER-STATEMENT OF THE ISSUES FOR REVIEW

### I.

Did the District Court err in granting the Defendant's Motion for Summary Judgment on the Plaintiff's claims under the Americans with Disabilities Act where the counseling at issue did not constitute a medical examination?

The Defendant answers – No.

The Plaintiff answers – Yes.

The District Court answered – No.

### II.

Does Plaintiff have standing to challenge the counseling where she did not attend the counseling and has suffered no concrete injury?

The Defendant answers – No.

## COUNTER-STATEMENT OF THE CASE

The Plaintiff filed suit against the Defendant for an alleged violation of the Americans with Disabilities Act (ADA). This case comes to this Court after the District Court granted the Defendant's motion for summary Judgment.

Plaintiff, Emily Kroll, is a former employee of the White Lake Ambulance Authority ("WLAA"). The WLAA is a municipal entity, formed by various municipalities north of the City of Muskegon, as an intra-governmental entity pursuant to Michigan statute.

The facts that were developed through discovery demonstrate Plaintiff has a long-standing history of emotional and behavioral problems. Unfortunately, Plaintiff's emotional and behavioral problems affected how she interacted at work to the point that in April 2008, she was advised she needed to undergo counseling and/or therapy. Plaintiff refused to do so and turned in her keys and equipment. She and has not worked at WLAA since.

The counseling that Plaintiff was instructed to attend did not constitute a medical examination under the ADA. Further, the Plaintiff lacks standing to bring the ADA claims. Accordingly, Defendant WLAA was entitled to summary judgment. The District Court's decision was proper and should be affirmed by this Court.

## COUNTER-STATEMENT OF FACTS

Plaintiff was hired at WLAA as an EMT Basic on October 22, 2003. As an EMT Basic, she traveled with a paramedic in a White Lake Ambulance vehicle to assist in the rendering of care to injured or ill individuals. She operated the ambulance while the paramedic provided assistance, care, and treatment to the patient enroute to the hospital.

In 2004, Plaintiff had an abortion resulting from a relationship she was having with a fellow employee at the WLAA. In 2007, she started an affair with Joshua Easton, another employee at the WLAA. Easton testified the sexual phase of the affair lasted upwards of 4 months. He described his relationship with Plaintiff as "rocky," due to differences of opinion as to what form the relationship would take. (R. 50, Ex. E, p. 11). Easton promised Plaintiff he was going to get a divorce. He never carried through on his promise. (*Id.* p. 12). Plaintiff expressed concerns why Easton wasn't getting divorced and showed jealousy towards him. (*Id.* pp. 13 – 14). Easton testified he attempted to break off the relationship with Plaintiff on several occasions. One of the occasions occurred when he became jealous because Plaintiff was not focusing enough attention on him. (*Id.* pp. 18 – 19).

Co-employees testified about Plaintiff getting into verbal confrontations and yelling at fellow employees. They characterized Plaintiff's actions as bringing her

4

personal life into the work place. (R. 50, Ex. D, pp. 22, 26; Ex. G, pp. 12, 14 – 15). Easton testified while he was working, Plaintiff would send him text messages or e-mails, inquiring what he was doing. (R. 50, Ex. E, p. 14). He further testified Plaintiff called him to scream and yell at him over the phone. (*Id.* p. 16). Mark Terpstra, a paramedic, testified Plaintiff would on occasion talk to and argue with Easton on her cell phone while she operated an ambulance. (R. 50, Ex. H, pp. 23 – 25, 30, 32). The WLAA Director, Brian Binns, had banned cell phone usage while operating a White Lake Ambulance Authority vehicle. (Ex. I). In his April 6, 2005, memo to WLAA staff, Binns clearly articulated the dangers associated with operating a vehicle while using a cell phone.

In addition to using a cell phone and arguing with Easton while she was operating an ambulance, Plaintiff also used her cell phone to send text messages to Easton while operating the WLAA's ambulance. (R. 50, Ex. E, p. 14; Ex. D, pp. 28 – 29; Ex. H, pp. 40 – 41). The concerns of Mark Terpstra and Jodi Osborn pertaining to Plaintiff's actions while operating an ambulance were communicated to Jean Dresen and to Brian Binns. (R. 50, Ex. D, pp. 21, 29, line 24; Ex. H, pp. 25 – 27, 32).

During the spring of 2008, Plaintiff developed a friendship with a fellow employee, Amy Callison. Callison prepared a written statement for White Lake Ambulance Authority, because she was concerned about Plaintiff. (R. 50, Ex. J, p.

6). Callison testified she went to Binns to express her concerns about Plaintiff's well-being. During her deposition, Callison testified as follows:

> Q What did you tell Brian Binns in that occasion that you met with him?
>
> A That I was concerned for her. That she needed counseling. And I even told Emily that she needed counseling. I think that would help her in the long run to go through, because she was an emotional wreck.

(*Id*. p. 12). Callison further testified in the spring of 2008 she felt that Plaintiff was suicidal, that Plaintiff was extremely emotional, and she did not want Plaintiff to hurt herself. She reported these concerns to Binns. (*Id*. p. 14). Callison went to talk to Binns after she had talked to Plaintiff about the need for counseling, and Plaintiff refused. (*Id*. p. 15). Callison testified it got so bad that she finally had to request Plaintiff to stop texting her. Plaintiff was texting Callison all the time, and Callison's phone bills were getting too high. (*Id*. p. 18). Callison further testified to an incident in which Plaintiff followed her to a grocery store, parked next to Callison's vehicle, and when Callison got out of the store, Plaintiff was in her car "bawling." (*Id*. pp. 15 – 16). Callison further testified on several occasions Plaintiff told her she "wanted to go into a big black hole and disappear." Callison testified when Plaintiff reported this to her, she finally decided she needed to go to Binns and tell him that something needed to be done, because Plaintiff possibly was suicidal. (*Id*. pp. 18 – 19).

Jean Dresen was inundated with reports from fellow employees of concerns about Plaintiff's emotional well-being. (R. 50, Ex. K, pp. 27 – 30; see also Ex. L). Indeed, on one occasion, Plaintiff called Dresen at night while Plaintiff was on duty at the WLAA. Plaintiff was crying. Dresen communicated this incident to Binns, as well. (R. 50, Ex. K, p. 23).

In response, Binns tried to verify with WLAA employees of their observations of Plaintiff's emotional well-being. Plaintiff's good friend, Kathy Sturgis, testified Binns approached her in April, 2008, advised he had been receiving information from people that Plaintiff was emotionally unstable, and solicited her opinion. Sturgis also heard that Kroll had been reported as using her cell phone and texting while operating an ambulance before Plaintiff was requested to seek counseling. Binns also expressed his concern to Sturgis about the report of Plaintiff using a cell phone or texting while operating an ambulance. (R. 50, Ex. M, pp. 26 – 28).

A week prior to April 28, 2008, Jean Dresen and Brian Binns talked about their mutual concerns with the behavior being manifested by Emily Kroll. Binns directed Dresen to contact Hackley Work Place Health to see if they could find someone to assist Plaintiff. (R. 50, Ex. K, pp. 35 – 36; Ex. N, p. 66). Accordingly, Dresen contacted Plaintiff and told her about possible arrangements to receive therapy or counseling. Dresen requested Plaintiff to sign a release so the WLAA

could verify Plaintiff was attending the weekly meetings. In 2007, Plaintiff had agreed she had needed some counseling and therapy at that time, and Dresen later found out that Plaintiff had never attended and lied about having done so. (R. 50, Ex. K, pp. 39 – 41).

The problems with Plaintiff came to a head on April 28, 2008. Prior to that date, Plaintiff had forwarded to Jodi Osborn an e-mail which Plaintiff previously had sent to Easton. In the e-mail, Plaintiff was inquiring of Easton as follows: "Have u done Jodi? Or anything sexually with her at all?" (R. 50, Ex. O; Ex. F, pp. 155, 166 – 167). Plaintiff and Osborn got into an argument during an ambulance call regarding the e-mail Plaintiff had forwarded to Osborn. (R. 50, Ex. F, p. 167; Ex. D, p. 16). During the argument between Plaintiff and Osborn, they were in back of the ambulance administering care to a patient. Osborn, as the paramedic, requested that Plaintiff administer oxygen to the patient. Plaintiff failed to respond to this order. Plaintiff was right next to Osborn when she requested Plaintiff to administer the oxygen to the Plaintiff, so there was no question Plaintiff heard Osborn's directive. (R. 50, Ex. D, pp. 26 – 27). When she got back to the WLAA garage, Osborn told Binns about Plaintiff's behavior on the ambulance run, and Plaintiff's failure to follow her request to administer oxygen to the patient. (*Id*. pp. 35 – 36).

Plaintiff and her father went to the ambulance garage around noon to talk to Binns. Prior to Binns talking to Plaintiff, he talked to Kathie Sturgis about Plaintiff's problems. Binns told Sturgis he was going to tell Plaintiff she had to go to counseling, and that Plaintiff would be able to retain her job. (R. 50, Ex. M, pp. 50 – 51).

When Plaintiff and her father got to the WLAA, a discussion and argument ensued. Plaintiff was advised the WLAA had set up possible arrangements for counseling or therapy for her, that she needed to go to the counseling or therapy, and that she would be able to retain her job. Plaintiff concedes that as of April 28, 2008, she had emotional problems which required treatment or therapy. She testified she needed the treatment or therapy because of "the abuse that I went through from Josh . . . and . . . the abuse I went through working there with some of the people." (R. 50, Ex. F, pp. 175 – 176). Plaintiff further testified the treatment or counseling was not offered free of charge, and that if she had the funds to get the treatment or counseling she would have gone. (*Id.* pp. 177 – 178). In any event, Plaintiff refused to seek any treatment or therapy, threw her equipment on Binns' desk, turned on her heels, and walked out. (*Id.* p. 178). Plaintiff has not worked at the WLAA since.

## COUNTER-STATEMENT OF THE STANDARD OF REVIEW

"The standard of review for summary judgment is de novo." *Sperle v. Mich. Dep't of Corr.,* 297 F.3d 483, 490 (6th Cir.2002).  Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.  Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.,* 542 F.3d 529, 534 (6th Cir. 2008).

## SUMMARY OF THE ARGUMENT

The District Court properly granted the Defendant's motion for summary judgment on the Plaintiff's claim under the ADA, and specifically 42 U.S.C. § 12112(d)(4)(A). The Plaintiff was instructed to receive counseling due to admitted emotional issues that were disrupting the operation of the White Lake Ambulance Authority. Plaintiff asserted that the counseling constituted a medical examination under § 12112(d)(4)(A). The District Court properly ruled that the counseling was not a medical examination under the ADA.

While the term "medical examination" is not defined in the ADA, or the regulations promulgated pursuant to the ADA, the interpretive guidance issued by the EEOC provides some guideposts for making the determination. The District Court ruled that a "medical examination" includes tests or evaluations that yield results or data furnished to the employer. The record contains no evidence that the counseling was going to yield any results or data that would be furnished to the Defendant.

The EEOC Enforcement Guidance defines "medical examination" as "a procedure or test that *seeks information* about an individual's physical or mental impairments or health." EEOC Enforcement Guidance, ¶ 2. The EEOC also lists seven factors that may be considered in determining whether a test or procedure is a medical examination. Since the record demonstrates that only the first of the

seven factors could be found to be favorable to the Plaintiff, summary judgment was properly granted to the Defendant.

The Plaintiff argues on appeal that a reasonable inference can be drawn from the record evidence that the counseling included a "clinical evaluation" or a "psychological evaluation," and should therefore be deemed to be a medical examination under 42 U.S.C. § 12112(d)(4)(A). The Plaintiff's argument is misplaced and not supported by the record. Initially, Plaintiff contends that WLAA required Plaintiff to meet with a psychologist. That is both untrue and not supported by the record. Jean Dresen testified that she had a discussion with Plaintiff and gave her contact information for Hackley Workplace Health. Dresen did not speak directly to a healthcare provider. Dresen testified that her goal was to have Plaintiff talk to "someone" who could counsel her on mental health issues.

There is no record evidence in this case that the "counseling" Plaintiff was directed to attend involved the assessment of the plaintiff's mental condition or the reporting of that condition back to WLAA. The record evidence is that Dresen gave Plaintiff contact information to arrange counseling through Hackley Workplace Heath. Plaintiff testified that the WLAA Director, Brian Binns, did not tell her directly that she needed to have treatment for her emotional problems. Rather, she said Binns told her that Dresen had given her a list of places she could go. Plaintiff testified that she told Binns that she would go see someone if she

could go at no cost to herself. There is simply no record evidence upon which the Plaintiff can base an argument that the counseling was a medical examination under the ADA. Even the fact that Plaintiff was asked for a release was done so because Plaintiff had lied about undergoing counseling in the past, and WLAA wanted a means to verify that she was attending counseling. There is no evidence in the record that WLAA demanded a full release of all records, as opposed to a limited release to verify that plaintiff was attending. Given the uncontroverted testimony from Dresen that she wanted to ensure that Plaintiff attended the counseling, there is no basis for concluding otherwise.

Plaintiff's attempt to argue that the District Court did not draw reasonable inferences in favor of the Plaintiff is unavailing. All Plaintiff can do is offer speculation and conjecture under the guise of "reasonable inference." Speculation and conjecture will not substitute for "reasonable inferences." In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in her favor on more than mere speculation, conjecture, or fantasy.

Finally, Plaintiff lacks standing to assert an ADA claim, as she never underwent the counseling and has sustained no actual, concrete injury.

## ARGUMENT I

**THE DISTRICT COURT DID NOT ERR IN GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT WHERE THE COUNSELING AT ISSUE DID NOT CONSTITUTE A MEDICAL EXAMINATION.**

42 U.S.C. § 12112(d)(4)(A) provides: "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." Plaintiff alleged that WLAA violated this provision of the ADA when she was instructed to undergo counseling. The District Court agreed with the Defendant's argument on this point and ruled that counseling alone does not constitute a medical examination under the ADA. (R. 57, p. 6). The District Court's conclusion is correct and must be affirmed.

The District Court acknowledged that the term "medical examination" is not defined in the ADA, or the regulations promulgated pursuant to the ADA. (*Id.* pp. 6 – 7). However, the interpretive guidance issued by the EEOC provides some guideposts for making the determination. Although the EEOC's administrative interpretations of the ADA are not controlling authority, they "do constitute a body of experience and informed judgment to which courts and litigants may properly

resort for guidance." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65; 106 S. Ct. 2399 (1986). The District Court ruled that a "medical examination" includes tests or evaluations that yield results or data furnished to the employer. (*Id*. p. 7). 29 C.F.R. § 1630.14(c) provides that employers can require medical examinations ("fitness for duty exams") "when there is a need to determine whether an employee is still able to perform the essential functions of his or her job. . . ."

The EEOC Enforcement Guidance defines "medical examination" as "a procedure or test that *seeks information* about an individual's physical or mental impairments or health." EEOC Enforcement Guidance, ¶ 2. (Emphasis added). (R. 51, Ex. 8). The EEOC also lists several factors that may be considered in determining whether a test or procedure is a medical examination:

> "(1) whether the test is administered by a health care professional; (2) whether the test is interpreted by a health care professional; (3) whether the test is deigned to reveal an impairment of physical or mental health; (4) whether the test is invasive; (5) whether the test measure an employee's performance of a task or measures his/her physiological responses to performing the task; (6) whether the test normally is given in a medical setting; and (7) whether medical equipment is used."

*Id*. (Footnote omitted). The EEOC Enforcement Guidance gives examples of medial tests: vision tests; blood, urine and breath analysis to check for alcohol; blood pressure testing; and "psychological tests that are designed to identify a mental disorder or impairment." *Id*. Tests or procedures that do not constitute

medical examinations include "psychological tests that measure personality traits such as honesty, preferences, and habits." *Id.*

The District Court ruled that there was nothing in the record that suggested that the counseling the Defendant required Plaintiff to attend involved or required psychological testing. (R. 57, p. 8). The District Court also ruled that there was no evidence in the record that any results, findings or other information derived from testing or evaluation would have been furnished to WLAA. (*Id.*). While WLAA did require a Release, it was for the limited purpose of verifying that Plaintiff actually attended counseling sessions. (*Id.*; Dresen Dep., R. 50, Ex. K, pp. 39 – 40). Plaintiff had previously been scheduled to attend counseling in 2007 but did not attend and told WLAA that she did attend. (*Id.*).

The District Court ruled that the only one of the seven factors that favored finding the counseling was a "medical examination" was the first; all others favored a finding that the counseling was not a medical examination. (R. 57, p. 8). Based on that fact, and the absence of any authority that would suggest that the counseling constituted a medical examination, the District Court granted the Defendant's motion for summary judgment. (*Id.* pp. 8 – 9).

The Plaintiff argues on appeal that a reasonable inference can be drawn from the record evidence that the counseling included a "clinical evaluation" or a "psychological evaluation," and should therefore be deemed to be a medical

examination under 42 U.S.C. § 12112(d)(4)(A). The Plaintiff's argument is misplaced and not supported by the record. The District Court's ruling must be affirmed.

The Plaintiff cites *Barnes v. Cochran*, 944 F. Supp. 87 (S.D. Fla. 1996), *aff'd sub nom. Barnes v. Broward County Sheriff's*, 130 F.3d 443 (11th Cir. 1997), for the unremarkable proposition that a psychologist's clinical evaluation that was conducted as a pre-employment psychological evaluation of an applicant was a "medical examination" under the ADA. This outcome is neither surprising nor relevant to this case. It is not surprising because 29 C.F.R. § 1630.14(c) defines "medical examinations" alternatively as "fitness for duty exams." It is not relevant because the Plaintiff was not required to undergo a fitness for duty exam.

The Court in *Barnes* stated that the EEOC regulations and guidelines "make clear that it is appropriate for an employer to undertake a limited inquiry into the ability of an applicant to perform the job he is seeking with or without reasonable accommodation. What the ADA prohibits, however, are specific inquiries into the details of an applicant's disability. Thus, an employer cannot ask how an individual became disabled or whether a particular condition 'is indicative of an underlying impairment.'" *Barnes v. Cochran*, 944 F. Supp. 897 at 904. The Court rejected the Defendant's argument that a fitness for duty examination was not a

medical examination unless its sole purpose was to determine if the applicant had a disability:

> The Court concludes that the pre-employment medical examination conducted by Defendant violated the ADA, 42 U.S.C. § 12112(d)(2)(A). This conclusion is compelled by the nature and extent of the examination performed, as reflected in Dr. Stock's Report, and by the fact that the examination was performed by a licensed psychologist. Dr. Stock's Report reflects that Plaintiff was referred for a "clinical evaluation ...." Dr. Stock's questions covered not only covered a wide range of incidents in Plaintiff's life, but probed areas tending to disclose specific psychological disabilities, such as Post Traumatic Stress Disorder. *See* Report, at 7 ("His current psychological testing does not suggest any underlying post-traumatic stress disorder, but does acknowledge that under stress he experiences flashbacks, nightmares, and other types of adjustment disorders."). Dr. Stock also reviewed the Plaintiff's medical records, which were compiled by other medical professionals. Finally, Dr. Stock performed the Minnesota Multiphasic Personality Inventory, the Inwald Personality Inventory, the Otis Lennon School Ability Test, the Hilson Profile/Success Quotient Test, and the California Psychological Inventory. Such an extensive examination constitutes a prohibited pre-employment medical examination.

*Barnes v. Cochran*, 944 F. Supp. at 904 – 905. *Barnes* has no application to this case. Contrary to the Plaintiff's argument, there are significant differences between this case and *Barnes*. Initially, plaintiff contends that WLAA required Plaintiff to meet with a psychologist. (Plaintiff's Brief, p. 18). That is both untrue and not supported by the record. Jean Dresen testified that she had a discussion with Plaintiff and gave her contact information for Hackley Workplace Health. (R.

53, Ex. 11, pp. 35 – 36). Dresen did not speak directly to a healthcare provider. (*Id*. p. 36). Dresen testified that her goal was to have Plaintiff talk to "someone" who could counsel her on mental health issues. (*Id*. p. 37). Dresen testified that she herself had "gotten help from a counselor" and thought Plaintiff could benefit. (*Id*.). There are numerous forms of counseling, and the Court can take judicial notice that many counselors are not psychologists. Indeed, many counselors would have neither the expertise nor the ability to conduct any type of a psychological evaluation. WLAA never required plaintiff to see a psychologist, and there is nothing in the record to suggest otherwise.

Plaintiff argues that the case cited by the District Court, *Jaques v. Herbert*, 447 F. Supp. 2d 858 (N.D. Ohio 2006) is inapplicable because it dealt with a drug treatment program rather than a psychological examination and treatment. (Plaintiff's Brief, p. 19). This attempt to distinguish *Jaques* is unavailing as the Plaintiff cannot demonstrate that the Plaintiff was required to undergo a psychological evaluation or treatment. Moreover, the Court's key finding on this issue in *Jaques* applies with equal force to the *record* facts of this case: "As to the stipulation in her last-chance agreement that Plaintiff attend a treatment program, Plaintiff has not shown that the treatment program amounts to a 'medical examination.' There is no evidence that the treatment program involved the

assessment of Plaintiff's medical condition or the reporting of that condition back to the Company." *Jaques v. Herbert*, 447 F. Supp. 2d at 874.

As the District Court found, there is no record evidence in this case that the "counseling" Plaintiff was directed to attend involved the assessment of the plaintiff's mental condition or the reporting of that condition back to WLAA. (R. 57, p. 9). The record evidence is that Dresen gave Plaintiff contact information to arrange counseling through Hackley Workplace Heath. (R. 53, Ex. 11, pp. 35 – 36). Plaintiff testified that the WLAA Director, Brian Binns, did not tell her directly that she needed to have treatment for her emotional problems. (R. 50, Ex. F, p. 139). Rather, she said Binns told her that Dresen had given her a list of places she could go. (*Id.*). Plaintiff testified that she told Binns that she would go see someone if she could go at no cost to herself. (*Id.*).

The case law, while sparse, does support the District Court's conclusion. The Sixth Circuit has held that "an employer's awareness of behavior that one might associate with an impairment does not of itself show treatment of an employee as disabled and that requiring an employee to see a psychologist before returning to work does not run afoul of the ADA." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999). While *Sullivan* is not directly on point, it certainly refutes Plaintiff's argument that being required to see a psychologist (even if true), does not automatically implicate the ADA. Additionally, this Court

observed in *Sullivan*: "Deteriorating performance may be linked to motivation or other reasons unrelated to disability, and even poor performance may not constitute a disability under the ADA." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d at 811.

In *Conroy v. New York State Dept. of Corr. Services*, 333 F.3d 88, 95-96 (2d Cir. 2003), the Second Circuit held that a company policy requiring employees returning from a medical leave to undergo an examination and provide a "general diagnosis" that the employee was fit to return to duty implicated the ADA. "Few courts have interpreted this provision, but one court has found that a requirement that employees disclose what prescription drugs they use is a prohibited inquiry, since such a policy would reveal disabilities (or perceived disabilities) to employers. *See Roe v. Cheyenne Mountain Conference Resort,* 920 F.Supp. 1153, 1154-1155 (D. Colo. 1996), *aff'd in pertinent part,* 124 F.3d 1221 (10th Cir.1997). Similarly, we believe that since general diagnoses may expose individuals with disabilities to employer stereotypes, the Policy implicates the concerns expressed in these provisions of the ADA." Unlike the facts in *Conroy*, here the Plaintiff was not ordered to undergo an examination. She was instructed to receive counseling. She was not directed to a particular counselor. Since she was not directed to a particular counselor, WLAA was in no position to instruct the counselor what to do, how to do it, or to report back to WLAA.

In *Indergard v. Georgia-Pac. Corp.*, 582 F.3d 1049, 1054 (9th Cir. 2009),

the court held that a physical capacity examination (PCE) was a medical test under

the ADA.  The differences between the PCE in *Indergard*, and what the record

evidence reveals about the counseling in this case is telling.

> In light of the agency guidance, Indergard's argument
> that the PCE was a medical examination is convincing.
> As noted above, the PCE included range of motion and
> muscle strength tests, and Starnes measured Indergard's
> heart rate and recorded an observation about her
> breathing after the treadmill test.  Each of these tests is
> within the EEOC's description of tests that are considered
> medical examinations.  The post-treadmill test heart rate
> measurement and notation regarding Indergard's
> "increased oxygen" intake and demonstration of "poor
> aerobic fitness" weigh heavily in favor of considering the
> PCE a medical exam, particularly because Starnes had
> already noted that Indergard "was able to walk for 20
> minutes at 2.8 mph on treadmill without increased
> antalgic behavior or objective findings of pain complaints
> noted."  Had Starnes's observations ended there, it might
> be appropriate to characterize the treadmill test as a test
> that measured Indergard's performance of a physical task.
> Measuring Indergard's heart rate and recording
> observations about her breathing and aerobic fitness,
> however, was not only unnecessary to determine whether
> she could perform the task, but is also the kind of
> examination that the *EEOC Enforcement Guidance*
> identifies as inappropriate to include in a non-medical
> physical agility or fitness test.

There is simply no record evidence upon which the Plaintiff can base an

argument that the counseling was a medical examination under the ADA.  Even

the fact that Plaintiff was asked for a release was done so because Plaintiff had lied

about undergoing counseling in the past, and WLAA wanted a means to verify that she was attending counseling. (R. 50, Ex. K, pp. 39 – 40). There is no evidence in the record that WLAA demanded a full release of all records, as opposed to a limited release to verify that plaintiff was attending. Given the uncontroverted testimony from Dresen that she wanted to ensure that Plaintiff attended the counseling, there is no basis for concluding otherwise.

Plaintiff then undertakes a lengthy discussion about the "reasonable inferences" that the District Court was required to draw from the facts. There are two primary flaws in the Plaintiff's argument: first, the "facts" are not as Plaintiff presents them. Second, as will be discussed in greater detail, *infra*, the Plaintiff never even went to counseling. Thus, all Plaintiff can do is offer speculation and conjecture under the guise of "reasonable inference." Speculation and conjecture will not substitute for "reasonable inferences." "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris, Inc.,* 355 F.3d 515, 533 (6th Cir.2004) (internal quotations omitted). The Plaintiff's refusal to undergo counseling not only relegates her claim to nothing more than speculation, conjecture and fantasy, it also means that the Plaintiff lacks standing to pursue these claims.

With respect to Plaintiff's "reasonable inference" argument, it is based on nothing more than piling multiple inferences, and rank speculation, together in a house of cards that will not withstand even the most cursory inspection. This Court's observation in *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 398-99 (6th Cir. 2009), is apt: "To impute allegedly discriminatory comments and conduct by non-decision making employees within the Department to Chief Quisenberry and conclude that discriminatory animus may have infected his denial of Risch's request for a promotion requires an inference upon inference – untethered to any proper evidentiary foundation."

The Plaintiff's "reasonable inferences" start with a "fact" that is not in the record: that Plaintiff was required to see a psychologist. As previously discussed, there was no such requirement. In fact, when Jeffrey Holmstrom was asked to agree that Plaintiff was required to undergo psychological counseling, he did not agree, stating that she was required to undergo "counseling." (R. 51, Ex. 13, pp. 11 – 12). Using that "fact" as a starting point, Plaintiff maintains that "it would be a reasonable inference that the psychologist selected by WLAA would have conducted a clinical evaluation." (Plaintiff's Brief, p. 21). The Plaintiff not only misstates the record by claiming that she had to see a psychologist, but she further compounds this misstatement by suggesting that WLAA selected the psychologist. Again, as previously discussed, the record establishes that the Plaintiff was given

contact information to arrange for counseling, not that a psychologist had been selected for her. Even if those misstatements are overlooked, however, there is no basis to infer that a counselor, even if a psychologist, would have conducted a clinical evaluation. Plaintiff bases this "inference" on the fact that a clinical evaluation was done in *Barnes*. In *Barnes*, however, the Plaintiff was sent for a psychological evaluation, not for counseling. *Barnes* has no application here, and Plaintiff offers no cogent reason that the District Court, or this Court, should draw an inference that a clinical evaluation would have been done if Plaintiff ever went to a counseling session.

The Plaintiff then makes a number of claims that the District Court drew improper inferences in favor of the Defendant because the District Court offered no support for, essentially, holding Plaintiff to her burden of defeating a motion for summary judgment. The Plaintiff is essentially attempting to shift the burden of proof onto the Defendant. The Plaintiff refused to attend counseling, now asserts that there are issues of fact because there is no record evidence to demonstrate what would have actually occurred if Plaintiff had gone to counseling. It is the Plaintiff's burden to establish through something other than speculation, conjecture and fantasy what would have happened; it is not the Defendant's burden to establish that Plaintiff's speculation is incorrect.

Plaintiff asserts: "The only way for the record to have been clear on this point was if Ms. Kroll would have agreed to participate in the prohibited treatment. But the law does not require a plaintiff to engage in a prohibited act simply to prove what would have likely taken place." (Plaintiff's Brief, p. 24). While it is true that if Plaintiff has participated in the counseling the results would not be subject to speculation, the rest of the Plaintiff's assertion is in error. First, the counseling was not "prohibited." That is the very point of the uncertainty. The counseling could have been done in a way that was completely consistent with the ADA. Plaintiff fails in her burden to establish that the counseling would have been "prohibited." Second, as will be discussed in greater detail, the law does require a plaintiff to sustain a concrete injury. The plaintiff's failure to actually determine if the counseling was actually "prohibited" by the ADA means she has no concrete injury and lacks standing.

Even assuming that the Court determines that the counseling was a medical examination, so that an issue of fact exists on that point, the remedy is not, as Plaintiff requests, a remand for trial. Defendant also sought summary judgment on the basis that it was a business necessity for the counseling to take place. The District Court did not address that issue, as it found the counseling was not a medical examination. The Defendant is entitled to a decision on the merits of that argument before the matter proceeds beyond the summary judgment stage.

## ARGUMENT II

## THE PLAINTIFF LACKS STANDING TO ASSERT A CLAIM UNDER THE ADA AS SHE NEVER UNDERWENT COUNSELING AND CANNOT DEMONSTRATE THAT SHE SUSTAINED AN ACTUAL CONCRETE INJURY.

That a plaintiff must establish standing is a fundamental element in determining federal jurisdiction over a "case" or "controversy" as set forth in Article III of the Constitution. *E.g., Raines v. Byrd,* 521 U.S. 811, 818; 117 S. Ct. 2312; 138 L.Ed.2d 849 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 37; 96 S.Ct. 1917; 48 L.Ed.2d 450 (1976)). "By now, it is axiomatic that a litigant demonstrates Article III standing by tracing a concrete and particularized injury to the defendant-whether actual or imminent-and establishing that a favorable judgment would provide redress. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61; 112 S. Ct. 2130; 119 L.Ed.2d 351 (1992)." *Morrison v. Bd. of Educ. of Boyd County*, 521 F.3d 602, 608 (6th Cir. 2008).

"To avoid conferring standing by way of guesswork, we require that a litigant demonstrate either a concrete harm or the threat of such harm. *Laird v. Tatum,* 408 U.S. 1, 13; 92 S.Ct. 2318' 33 L.Ed.2d 154 (1972); *ACLU v. Nat'l Sec.*

*Agency,* 493 F.3d 644, 660 (6th Cir. 2007)." *Morrison v. Bd. of Educ. of Boyd County*, 521 F.3d at 608. (Footnote omitted). The elements of Article III standing are not simply pleading requirements. *Lujan,* 504 U.S. at 561, 112 S. Ct. 2130. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."

Normally, an issue not raised below may not be raised on appeal. *In re Morris,* 260 F.3d 654, 663 (6th Cir. 2001). An alleged absence of jurisdiction may be raised at any time, however, see *Franzel v. Kerr Mfg. Co.,* 959 F.2d 628, 630 (6th Cir. 1992). Standing goes to the court's jurisdiction and may be raised on appeal.

In enacting the ADA, Congress provided that the remedies and procedures for ADA claims are those that have been provided under Title VII. Title I of the ADA, which deals with employment discrimination, allows a private right of action to "any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or [of] regulations promulgated [by the EEOC] ..., concerning employment." 42 U.S.C. § 12117(a).

*Albemarle Paper Co. v. Moody,* 422 U.S. 405; 95 S. Ct. 2362; 45 L.Ed.2d 280 (1975), is the seminal case defining the appropriate remedies under Title VII. In *Albemarle,* the Court established the general rule that in crafting remedies for

employment discrimination plaintiffs injured by discriminatory conduct, they are "to be placed, as near as may be, in the situation [they] would have occupied if the wrong had not been committed." *Id.* at 418 – 419. This is described as the "make whole" purpose of Title VII. *Id.* Although *Albemarle* was a Title VII case, the principles enunciated by the Supreme Court provide the appropriate framework for consideration of the remedial aspects of all federal employment discrimination laws. This is especially true of the ADA, where Congress explicitly incorporated the Title VII remedies.

In this case, Plaintiff cannot demonstrate that she has standing to bring suit as she never underwent counseling, which she claims was a medical examination under the ADA. Since Plaintiff did not undergo what she alleges to be the medical examination, she cannot demonstrate a concrete injury. The record evidence demonstrates that Plaintiff was not opposed to counseling, but did not have the means to pay for it. (R. 50, Ex. F, p. 139). On April 28, 2008 Plaintiff and her father went to the ambulance garage around noon to talk to Binns. Prior to Binns talking to Plaintiff, he talked to Kathie Sturgis about Plaintiff's problems. Binns told Sturgis he was going to tell Plaintiff she had to go to counseling, and that Plaintiff would be able to retain her job. (R. 50, Ex. M, p. 50). Plaintiff testified that she was willing to go to counseling, but did not have the money to pay for it.

(R. 50, Ex. F, p. 178). Plaintiff testified that she gave Binns her door key and pager during that conversation. (*Id.*).

In light of Plaintiff's testimony that she was not opposed to the counseling and voluntarily turned in her keys and pager (in essence quitting her job), she has not sustained an injury as a result of the claimed ADA violation. The courts that have addressed this issue have uniformly held that there is no viable ADA claim unless there has been an actual injury associated with a claimed violation of Section 12112(d)(4)(A). For example in *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 561 (5th Cir. 1998), the Fifth Circuit held: "Although it is unclear, it appears that Armstrong implicitly argues (or assumes) that a violation of section 12112(d)(4)(A) constitutes a compensable injury in fact. We reject this reading of the provision. This Court has been unable to find any indication either in the text of the ADA or in its legislative history that a violation of the prohibition against preemployment medical examinations and inquiries, in and of itself, was intended to give rise to damages liability."

In *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 519 (3d Cir. 2001), the Third Circuit held: "Other courts of appeals have addressed the question whether a plaintiff has a cause of action for a violation of § 12112(d) without demonstrating the existence of an injury-in-fact, either through actual damage (emotional, pecuniary, or otherwise), or through the presence of a continuing illegal practice to

30

which plaintiff is likely to be subject absent court intervention. All have concluded that a violation of § 12112(d), without such a showing, presents no 'injury' capable of remedy, and thus affords no basis for suit." In contrast, in *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 595 (10th Cir. 1998), the Tenth Circuit held that the Plaintiff "has sufficiently alleged that he suffered an injury in fact, specifically that Steeltek did not hire Griffin because of his responses to the impermissible questions, and he seeks damages and injunctive relief to remedy his injury. Consequently, we hold that his suit can go forward."

Plaintiff has no standing to bring suit because she never underwent the counseling and cannot demonstrate any concrete injury. She testified that she was willing to undergo the counseling. She testified that she turned in her keys and pager when she and her father went to talk to Binns on April 28, 2008. In light of the undisputed facts in this record, Plaintiff has no standing to maintain her claims. The Plaintiff's claims must be dismissed.

## CONCLUSION

WHEREFORE, Defendant-Appellee, White Lake Ambulance Authority,

respectfully requests this Court affirm the judgment of the District Court.

Respectfully submitted,

PLUNKETT COONEY

Dated: February 1, 2011          By:   s/Michael S. Bogren
                                       MICHAEL S. BOGREN (P34835)
                                       Attorneys for Defendant-Appellee
                                       950 Trade Centre Way, Suite 30
                                       Kalamazoo, MI 49002
                                       (269) 226-8822
                                       E-mail:  mbogren@plunkettcooney.com

Case No. 10-2348

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

EMILY KROLL,

Plaintiff-Appellant,

v.

WHITE LAKE AMBULANCE AUTHORITY,

Defendant-Appellee.

Appeal from the United States District Court for the
Western District of Michigan, Southern Division

## **CERTIFICATE OF COMPLIANCE**

STATE OF MICHIGAN    )
                        ) ss.
COUNTY OF KALAMAZOO )

     MICHAEL S. BOGREN, being first duly sworn, certifies and states the following:

     1.    That he is a shareholder with the firm Plunkett Cooney, and is in principal charge of the above-captioned cause for the purpose of preparing the attached brief on appeal;

2.     That the brief on appeal prepared by his office complies with the type-volume limitation;

3.     That Plunkett Cooney relies on the word count of their word processing system used to prepare the brief; and

4.     The word processing system counts the number of words in the brief as 6,921.

s/Michael S. Bogren
MICHAEL S. BOGREN

Case No. 10-2348

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

EMILY KROLL,

Plaintiff-Appellant,

v.

WHITE LAKE AMBULANCE AUTHORITY,

Defendant-Appellee.

Appeal from the United States District Court for the
Western District of Michigan, Southern Division

## CERTIFICATE OF SERVICE

STATE OF MICHIGAN          )
                           )ss.
COUNTY OF KALAMAZOO )

Michael S. Bogren, being first duly sworn, deposes and says that he is
employed by PLUNKETT COONEY and that on the 1st day of February, 2011, he
caused to be served a copy of the Brief on Appeal of Defendant-Appellee White
Lake Ambulance Authority and this Certificate of Service upon all parties or their
counsel of record through the CM/EMF system if they are registered users or, if

they are not, by placing a true and correct copy in the United States mail,

postage prepaid, to their address of record.

PLUNKETT COONEY

By:  s/Michael S. Bogren
MICHAEL S. BOGREN (P34835)
Attorneys for Defendant-Appellee
950 Trade Centre Way, Suite 310
Kalamazoo, MI 49002
(269) 226-8822
E-mail: mbogren@plunkettcooney.com

Case No. 10-2348

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

EMILY KROLL,

Plaintiff-Appellant,

v.

WHITE LAKE AMBULANCE AUTHORITY,

Defendant-Appellee.

Appeal from the United States District Court for the
Western District of Michigan, Southern Division

## DESIGNATION OF APPENDIX CONTENTS:

| Description of entry no. | Date | Record Entry |
|---|---|---|
| Defendant's Brief in Support of Motion for Summary Judgment (including Exhibits A-P) | 6/9/2010 | 50 |
| Plaintiff's Response in Opposition to Motion for Summary Judgment (including Exhibits 1-5) | 7/7/2010 | 51 |
| Plaintiff's Exhibits 11-15 to Response in Opposition to Motion for Summary Judgment | 7/7/2010 | 53 |
| Opinion | 8/19/2010 | 57 |